Filed 11/9/10 by Clerk of Supreme Court

IN THE SUPREME COURT

STATE OF NORTH DAKOTA

2010 ND 210

State of North Dakota, Plaintiff and Appellee

v.

Billy Joe Valdez Aguero, Defendant and Appellant

No. 20090241

State of North Dakota, Plaintiff and Appellee

v.

Joseph Daniel Moncada, Defendant and Appellant

No. 20090254

Appeal from the District Court of Grand Forks County, Northeast Central Judicial District, the Honorable Lawrence E. Jahnke, Judge.

AFFIRMED.

Opinion of the Court by Sandstrom, Justice.

Mark Jason McCarthy, Assistant State’s Attorney, P.O. Box 5607, Grand Forks, N.D. 58206-5607, for plaintiff and appellee.

Benjamin C. Pulkrabek, 402 1st Street Northwest, Mandan, N.D. 58554-3118, for defendant and appellant Billy Joe Aguero.

Robert Wade Martin, North Dakota Public Defenders’ Office, 11 1st Avenue Southwest, Minot, N.D. 58701, for defendant and appellant Joseph Daniel Moncada.

State v. Aguero

Nos. 20090241 & 20090254

Sandstrom, Justice.

[¶1] Billy Joe Valdez Aguero and Joseph Daniel Moncada appeal from criminal judgments entered after a jury found they were each guilty of two counts of murder and two counts of conspiracy to commit murder.  We affirm the judgments.

I

[¶2] At approximately 11:45 p.m. on September 7, 2001, the bodies of Robert Belgarde and his son, Damien Belgarde, were found in a rural area near Grand Forks.  Robert and Damien Belgarde each had several gunshot wounds, and Robert Belgarde suffered from a blunt force injury to his head.  Law enforcement recovered a broken beer bottle, a partially smoked cigarette, unspent 9 mm cartridges, bullet casings, and fired bullets from the crime scene. 

[¶3] In August 2008, Aguero and Moncada were each charged with two counts of murder in violation of N.D.C.C. § 12.1-16-01, a class AA felony, and two counts of conspiracy to commit murder in violation of N.D.C.C. § 12.1-06-04, a class AA felony, for the deaths of Robert and Damien Belgarde.  The State alleged the Belgardes contacted Moncada to purchase drugs, Aguero and Moncada met the Belgardes at a grocery store, and Aguero and Moncada took the Belgardes to a rural area near Grand Forks where they hit Robert Belgarde on the head with a beer bottle and shot the Belgardes multiple times.

[¶4] The cases were joined for trial.  Moncada was in prison in Minnesota at the time he was charged with the murders and he filed a request for final disposition under the Agreement on Detainers, requesting speedy disposition of the detainer under N.D.C.C. § 29-34-01.  On January 30, 2009, the State moved to extend the time for the detainer, and Moncada objected.  The court granted the State’s motion.  Before trial, Moncada’s attorney requested the defendants wear non-visible restraints, and the court granted the request.  A jury trial was held June 15-25, 2009.  Moncada and Aguero wore leg restraints during the trial.  The jury found Aguero and Moncada were both guilty as charged. 

[¶5] The district court had jurisdiction under N.D. Const. art. VI, § 8, and N.D.C.C. § 27-05-06.  The appeal was timely under N.D.R.App.P. 4(b).  This Court has jurisdiction under N.D. Const. art. VI, §§ 2, 6, and N.D.C.C. § 29-28-06. 

[¶6] After the appeal was filed, the defendant moved to remand the case to the district court to correct the record to reflect that restraints were visible to the jury.  This Court remanded to the district court to hear the motion.  After an evidentiary hearing, the district court denied the motion to amend the record.

II

[¶7] Aguero and Moncada argue they were denied the right to a fair trial because they were required to wear leg restraints during the trial. They claim the leg restraints were visible and the court did not make any findings that the restraints were necessary for courtroom security. 

[¶8] We review a district court’s decision whether to use physical restraints during court proceedings for an abuse of discretion.  
State v. Kunze
, 2007 ND 143, ¶ 14, 738 N.W.2d 472.  A court abuses its discretion when it acts in an arbitrary, unreasonable, or unconscionable manner, or when it misinterprets or misapplies the law, or when its decision is not the product of a rational mental process leading to a reasoned determination.  
Id.
 

[¶9] 
In 
Deck v. Missouri
, 544 U.S. 622, 629 (2005), the defendant was shackled with leg irons, handcuffs, and a belly chain that were visible to the jury, and the United States Supreme Court held that the Constitution forbids the routine use of visible shackles during the guilt phase of a criminal trial, unless the use is justified by an essential state interest:

[T]he Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial.  Such a determination may of course take into account the factors that courts have traditionally relied on in gauging potential security problems and the risk of escape at trial.  

[¶10] State interests justifying the use of visible restraints include physical security, escape prevention, and courtroom decorum.  
Deck
, 544 U.S. at 628.  In deciding whether restraints should be used, a trial court should consider various factors, including the accused’s record, temperament, desperateness of his situation, his physical condition; the security situation in the courtroom and courthouse; and whether there was an adequate means of providing security that was less prejudicial.  
Kunze
, 2007 ND 143, ¶ 18, 738 N.W.2d 472.  If visible restraints are used, the court must make case-specific findings and explain its reasons on the record, justifying the use.  
Id.
 at ¶¶ 18, 21, 24.  When a court, “without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation.  The State must prove ‘beyond a reasonable doubt that the shackling error complained of did not contribute to the verdict obtained.’”  
Deck
, at 635 (quoting 
Chapman v. California
, 386 U.S. 18, 24 (1967)). 

[¶11] In a pretrial motion Moncada requested the court order the defendants wear non-visible restraints:

counsel for the Defendant is requesting that Joseph Daniel Moncada be allowed to appear before the finder of fact without visible restraints and in non-jail garb.  There is a restraint that may be worn underneath the clothing of an accused that is more than adequate for security and still allows sedate movement to and from the witness stand with nothing more than a limp. 

Aguero joined Moncada’s motion.  In the March 19, 2009, pretrial conference the court granted Moncada’s motion, stating, “we’ll grant the Defendant’s Motion for street attire and non-visible restraints.”  The defendants requested the court order non-

visible restraints, and the court granted the motion.  Because the defendants requested restraints, they waived any claim that the court violated their constitutional rights by failing to make the required findings about the necessity of restraints.  
Cf.
 
State v. Klose
, 334 N.W.2d 647, 651 (N.D. 1983) (“a person legally should not be permitted to benefit from an error resulting from or through the action that he promoted or instigated”; a defendant cannot complain and use to his advantage an error caused by the court’s actions at the defendant’s request).

[¶12] We have also said a court’s findings on the necessity of restraints should include “the reason for not accommodating a request for one type of restraint rather than the other when the reason is not obvious on the record.”  
Kunze
, 2007 ND 143, ¶ 24, 738 N.W.2d 472.  If Moncada’s pretrial motion can be interpreted as a request for a specific type of restraint, the court granted the motion as requested.  Although Moncada and Aguero were later restrained with leg shackles instead of restraints worn under clothing, the court did not make any findings about the reason for not accommodating the defendants’ request.  The defendants objected to the leg shackles, arguing they were potentially visible to the jury.  Although an argument that there should have been findings about the reason for not accommodating the defendants’ request for a certain type of restraint could have been raised more clearly, it was error to use another type of restraint without the required findings.

[¶13] The 
Deck
 standard applies “where a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury,” 
Deck
, 544 U.S. at 635, but failure to make findings about the court’s reason for not accommodating a request for a specific type of restraint is harmless when there is no evidence the jury saw the restraints or the restraints interfered with a defendant’s defense.  
See
 
People v. McWhorter
, 212 P.3d 692, 732 (Cal. 2009) (an unjustified or unadmonished shackling is harmless when there is no evidence the jury saw the restraints); 
Mendoza v. Berghuis
, 544 F.3d 650, 654-55 (6th Cir. 2008) (
Deck
 applies only to visible restraints).  In this case, there is no evidence in the trial record that the jury saw the restraints.  It is not clear from the record what type of restraints the defendants were wearing, only that they were leg restraints with chains.  There is evidence in the record that the tables the defendants sat at during the trial blocked the view the jury had of their feet and that boxes were placed around the table to further obstruct the jury’s view.  The court specifically found the view of the defendants’ feet was properly obstructed.  Although Aguero claims jurors may have seen or heard the restraints when they were unexpectedly brought into the courtroom on one occasion and the defendants rushed to their seats, the parties did not approach the court during the trial with any concerns or request the record reflect the jury saw or heard either of the defendants’ restraints.  There was no evidence from jurors that they saw the restraints.  
Cf.
 
Rhoden v. Rowland
, 172 F.3d 633, 636 (9th Cir. 1999) (five jurors testified they saw the restraints during the trial).  There is nothing in the record supporting the defendants’ claims that the restraints were visible, and the defendants do not claim the leg restraints interfered with their defense or prevented them from communicating with their attorneys.  Moreover, the evidence in the record is overwhelmingly in support of the guilty verdicts.  We conclude the error was harmless.  N.D.R.Crim.P. 52(a).  

[¶14] On the basis of this record, we conclude there was no reversible error in requiring that Aguero and Moncada wear restraints during the trial.  

III

[¶15] Moncada argues his Sixth Amendment right to confront witnesses against him was violated when the district court allowed a witness to testify about Damien Belgarde’s statement that he was meeting Moncada at a grocery store on the night of the murders.  He contends the United States Supreme Court limited the right to use any of a decedent’s out-of-court statements in 
Giles v. California
, 128 S. Ct. 2678 (2008), and a decedent’s out-of-court statements are not admissible unless the statements are a dying declaration or the accused had a prior opportunity to cross-

examine the declarant.  

[¶16] We apply a de novo standard of review to a claim of a constitutional violation.  
State v. Sorenson
, 2009 ND 147, ¶ 16, 770 N.W.2d 701.  Under the Confrontation Clause of the Sixth Amendment of the United States Constitution, an accused has a right to confront the witnesses against him.  The United States Supreme Court has held the Sixth Amendment prohibits the admission of testimonial statements against an accused unless the declarant is unavailable to testify and the accused had a prior opportunity to cross-examine the declarant.  
Crawford v. Washington
, 541 U.S. 36, 68 (2004).  The Confrontation Clause does not apply to non-testimonial statements.  
Sorenson
, at ¶ 16. The United States Supreme Court has not specifically defined what a testimonial statement is, but has said, “An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not.”  
Crawford
, at 51.  This Court has held statements made to friends or family generally are not testimonial statements, and the Confrontation Clause does not apply.  
Sorenson
, at ¶ 20.

[¶17] In 
Giles
, 128 S. Ct. at 2681-82, the trial court allowed the admission of the murder victim’s statements made to a police officer responding to a domestic violence call.  The United States Supreme Court has held a defendant forfeits his Sixth Amendment right to confront a witness against him when his wrongful act made the witness unavailable to testify, only if the defendant engaged in the wrongful conduct with the intent to prevent the witness from testifying.  
Id.
 at 2684. Although Moncada argues this applies to all statements by a deceased declarant, the Court ruled confrontation rights apply only to testimonial statements, and the parties in that case did not dispute that the statements were testimonial.  
Id.
 at 2682.  
Giles
 did not extend Sixth Amendment confrontation rights to all statements made by a deceased declarant, including statements that are not testimonial.  
See
 
id.
 at 2692-93 (the Confrontation Clause excludes only testimonial statements, and statements to friends and neighbors may be excluded only by hearsay rules, if at all).   

[¶18] Here, a witness testified she was present when Damien Belgarde called Moncada at approximately 9:50 p.m. on September 7, 2001, Damien Belgarde said he was meeting Moncada at a nearby grocery store, and then the Belgardes left the apartment.  Damien Belgarde’s statements to the witness were casual remarks made to a friend or acquaintance.  
See
 
Sorenson
, 2009 ND 147, ¶ 20, 770 N.W.2d 701.  We conclude the statements were not testimonial and the admission of the statements did not violate Moncada’s confrontation rights.  

IV

[¶19] Moncada argues the district court erred in granting a continuance and failing to try him within 180 days of his request for speedy disposition of the detainer as required by N.D.C.C. § 29-34-01, the Interstate Agreement on Detainers (“IAD”).

[¶20] We have explained the standard of review for deciding whether good cause exists to grant additional time:

Legal logic dictates sound discretion is the proper standard to be applied on the question whether or not good cause existed for extension or continuance, and that an appellate court will not reverse such decision except in instances where the trial judge abused his discretion.  We have repeatedly stated that abuse of discretion is the equivalent of acting unreasonably, arbitrarily or unconscionably. 

State v. Foster
, 1997 ND 8, ¶ 6, 560 N.W.2d 194 (quoting 
State v. Kania
, 341 N.W.2d 361, 365 (N.D. 1983)).

[¶21] “[A] detainer is a notification filed with the institution in which a prisoner is serving a sentence, advising that he faces pending criminal charges in another jurisdiction and requesting the institution to hold the prisoner or give notice when his release is imminent.”  
State v. Moe
, 1998 ND 137, ¶ 20, 581 N.W.2d 468.  “The IAD provides a method for the orderly disposition of detainers filed by one jurisdiction on prisoners incarcerated in another jurisdiction.”  
Id.
 at ¶ 8.  Section 1 of Article III of the IAD, as codified in N.D.C.C. § 29-34-01, provides:

Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state, and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred eighty days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer’s jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint; provided that for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance.

[¶22] When deciding whether there is good cause to grant additional time, we consider the length of the delay, the reason for the delay, the defendant’s assertion of his right, and whether there is prejudice to the defendant.  
State v. Moore
, 2007 ND 7, ¶ 6, 725 N.W.2d 910.  Delay is not presumptively prejudicial, and a lack of prejudice substantially weakens a claim.  
Id.
 

[¶23] After a hearing on the State’s motion, the district court found there was good cause to grant a continuance for a reasonable amount of time:

[T]his court determines that the State has met its burden of showing good cause why the 180 disposition timeline should be continued for a reasonable amount of time after March 8, 2009.  This matter has been processed without unnecessary delay, and any lengthy delays which have occurred have been as a result of the conflict discovered between the initial court-appointed counsel and the Defendant (October 8, 2008-

November 10, 2008), those sought by the Defendant’s counsel to afford ample preparation for the Preliminary Hearing (November 12, 2008-

January 16, 2009), and those necessitated by defense counsel’s unavailability for hearing the State’s motion (February 6, 2009-

February 27, 2009).

[¶24] In considering the length of time of the delay, we have said, “The allowable delay for a minor street crime is considerably less than that for a more serious and complex charge.”  
Moore
, 2007 ND 7, ¶ 7, 725 N.W.2d 910.  Moncada claims the trial was required to begin on March 8, 2009.  The trial began on June 15, 2009, which was approximately 100 days after the 180-day period ended.  Although there was a significant delay in this case, all of the factors must be given weight, and none of the factors is controlling, including the length of the delay.  
Id.
 at ¶ 6.  

[¶25] The second factor to consider is the reason for the delay.  In August 2007, Moncada began serving a thirty-nine month sentence for a conviction of a drug-

related offense in Minnesota and was scheduled to be released on May 14, 2009.  Moncada was charged in this case in August 2008, and his request for final disposition was filed on September 9, 2008.  Moncada’s request for court-appointed counsel was approved and counsel was appointed in early October 2008, but his counsel informed the court there was a conflict in November 2008 and new counsel was appointed.  A preliminary hearing was scheduled for November 12, 2008, but Moncada requested a continuance and the hearing was rescheduled for January 16, 2009.  On January 30, 2009, the State moved to extend the period for the detainer, and Moncada’s counsel indicated he would not be available for a hearing on the motion until the last week of February.  Moncada was responsible for many of the delays in the proceedings. 

[¶26] We must also consider Moncada’s assertion of his right and any prejudice.  There are three types of prejudice: oppressive pretrial incarceration, anxiety caused by the delay, and an impaired defense.  
Foster
, 1997 ND 8, ¶ 12, 560 N.W.2d 194.  Moncada does not claim there was any anxiety caused by the delay or that his defense was impaired.  Moncada was not subject to oppressive pretrial incarceration.  Moncada was not scheduled to be released from his incarceration in Minnesota until a month before the trial began, and his pretrial incarceration was not unreasonable under the facts of this case.  Any prejudice caused by the delay was not legally significant.  
Cf.
 
Moore
, 2007 ND 7, ¶ 9, 725 N.W.2d 910 (no prejudice when defendant is incarcerated on another charge during the delay). 

[¶27] Here, Moncada was responsible for much of the delay in the proceedings and he has not shown or alleged any prejudice.  The court reasonably concluded there was good cause.  We conclude the court did not act unreasonably, arbitrarily, or in an unconscionable manner, and it did not abuse its discretion.  

V

[¶28] Aguero argues the district court erred in allowing Investigator Larry Hoffman to comment during the trial on Aguero’s decision to remain silent during an interview.  
On September 17, 2001, law enforcement officers 
from the Grand Forks County Sheriff’s Department
, including Hoffman, went to Aguero’s residence and asked him to come to the police station for an interview.  Aguero agreed to go to the station, he was advised of his rights under 
Miranda v. Arizona
, 384 U.S. 436 (1966), and he was cooperative and answered the officers’ questions.  
During the trial Hoffman testified about questioning Aguero:

Q. At the end of the interview did you ask—

. . . .

Q. Investigator Hoffman, near the end of the interview did you ask Mr. Aguero if he was with Joe and met Robert and Damien on Friday night?

A. Yes.

Q. What was his response?

A. There was no response.  He would not admit it or deny that he was with them.

Aguero objected to this testimony, arguing it was prohibited because he invoked his right to remain silent, but the court overruled his objection.  

[¶29] In 
Doyle v. Ohio
, 426 U.S. 610, 619 (1976), the United States Supreme Court held 
Miranda
 warnings carry an implicit assurance that silence will not carry a penalty, and the use at trial of post-arrest, post-
Miranda
 silence for impeachment purposes violates the Due Process Clause of the Fourteenth Amendment.  The Court further explained the “use of silence for impeachment was fundamentally unfair in 
Doyle
 because ‘
Miranda
 warnings inform a person of his right to remain silent and assure him, at least implicitly, that his silence will not be used against him. . . . 
Doyle
 bars the use against a criminal defendant of silence maintained after receipt of governmental assurances.’”  
Fletcher v. Weir
, 455 U.S. 603, 606 (1982) (quoting 
Anderson v. Charles
, 447 U.S. 404, 407-08 (1980)).  
See also
 
Jenkins v. Anderson
, 447 U.S. 231, 239-40 (1980) (use of pre-arrest silence for impeachment purposes did not violate fundamental fairness guaranteed by the Fourteenth Amendment because no governmental action or assurances induced the defendant to remain silent).

[¶30] Aguero had received the 
Miranda
 warning and had been advised of his right to remain silent.  Once an individual has been advised of his rights, questioning must cease if he indicates he wishes to remain silent.  
See
 
State v. Greybull
, 1998 ND 102, ¶ 15, 579 N.W.2d 161.  An individual also may selectively waive the right to remain silent and answer some but not all of the questions.  
See, e.g.
, 
United States v. Jumper
, 497 F.3d 699, 704 (7th Cir. 2007); 
United States v. Lorenzo
, 570 F.2d 294, 297-98 (9th Cir. 1978).  The individual, however, must indicate that he is invoking that right, and silence alone may not be sufficient to invoke the right.  
See
 
Jumper
, at 705-06; 
see also
 
Berghuis v. Thompkins
, 130 S. Ct. 2250, 2260 (2010) (invocation of right to remain silent must be unambiguous, and defendant did not invoke the right when he remained silent for a period of time).

[¶31] Here, Aguero was cooperative and answered the officer’s questions during the interview, but he remained silent in response to a question at or near the end of the interview.  It is unclear from this record whether Aguero invoked his right to remain silent.  Even if this was an improper use of Aguero’s post-
Miranda
 silence, however,  harmless error analysis is appropriate.  
See
 
State v. Hill
, 1999 ND 26, ¶ 17, 590 N.W.2d 187.  The following factors should be considered in deciding whether the improper use of a defendant’s silence was harmless error:

1. The use to which the prosecution puts the [post-
Miranda
] silence.

2. Who elected to pursue the line of questioning.

3. The quantum of other evidence indicative of guilt.

4. The intensity and frequency of the reference.

5. The availability to the trial judge of an opportunity to grant a motion for mistrial or to give curative instructions.

Id.

[¶32] The testimony about Aguero’s post-
Miranda
 silence was in response to a question from the prosecutor and was used as substantive evidence of his guilt.  However, the comment was brief, the State did not refer to his silence at any other time during the trial, Aguero did not move for a mistrial, and there was considerable evidence of Aguero’s guilt.  

[¶33] There was testimony Aguero told a friend on the evening of September 7, 2001, that someone owed him money and “they were going to get dealt with.”  Witnesses testified they saw Aguero and Moncada together on the night of the murders.  There was evidence Robert and Damien Belgarde called Moncada to purchase drugs, they arranged to meet Moncada at a grocery store, and they left the apartment they were at and walked to a nearby grocery store around 9:50 p.m.  A witness testified she saw the Belgardes sitting outside the grocery store at approximately 10 p.m., they were still there when she left the store approximately fifteen minutes later, and it appeared they were waiting for someone.  Aguero was photographed by a surveillance camera at the grocery store at 10:10 p.m.  Witnesses testified they saw Aguero and Moncada in a dark-colored Chevrolet Cavalier on the night of the murders.  Law enforcement seized a black Chevrolet Cavalier at Aguero’s father’s house in September 2001, and the Cavalier’s tires were consistent with tire imprints at the scene of the murders.  Witnesses testified Moncada said he and Aguero shot two people and Aguero said he shot someone with Moncada.  There was evidence Moncada purchased two 9 mm handguns and three types of ammunition from an acquaintance a few weeks before the murders, and he used the same guns while target shooting at an abandoned farmstead during the winter before the murders.  There was testimony that two of the types of ammunition Moncada purchased were expensive and hard to find for sale in the area.  Unspent cartridges found at the crime scene were the same three types of ammunition Moncada purchased.  Cartridge casings found at the crime scene and some found at the abandoned farmstead were fired from the same gun.  There was evidence Moncada’s DNA was found on a partially smoked cigarette found approximately ten feet from Robert Belgarde’s body.  There was evidence Aguero could not be excluded as one of the sources of DNA on a beer bottle found at the crime scene.  Moncada’s DNA was found on cigarette butts in the Cavalier and Robert Belgarde’s DNA was consistent with DNA found on a cigarette butt in the Cavalier.  

[¶34] Considering the relevant factors based on this record, we conclude any error in allowing Hoffman’s testimony about Aguero’s post-
Miranda
 silence was harmless. 

VI

[¶35] Aguero argues the district court erred in allowing prejudicial hearsay testimony.  He contends the court erred in allowing Brandy Clauthier to testify about statements she claimed her cousin, Shannon Clauthier, made about the murders.  The State contends the statements were prior consistent statements and were not hearsay under N.D.R.Ev. 801(d)(1)(ii).

[¶36] Moncada called Brandy Clauthier as a witness.  Aguero objected, but the court allowed her to testify.  She testified Shannon Clauthier told her he and “a couple of guys” killed the Belgardes and he disposed of some clothing in the river.  The court advised the State it could ask who the two other individuals were.  Brandy Clauthier testified Aguero and Moncada were the two people Shannon Clauthier told her he had helped with the murders.  

[¶37] A district court has broad discretion over evidentiary matters, and we will not reverse the court’s decision unless the court abused its discretion.  
State v. Stoppleworth
, 2003 ND 137, ¶ 6, 667 N.W.2d 586.  A statement is not hearsay if “[t]he declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with the declarant’s testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive . . . .”  N.D.R.Ev. 801(d)(1); 
see also
 
State v. Wegley
, 2008 ND 4, ¶ 17, 744 N.W.2d 284.  We have explained the requirements for qualification as nonhearsay under the rule:

First, the declarant must have testified and been subject to cross-

examination about the statement.  Second, the statement must be offered to rebut a charge of recent fabrication or improper influence or motive.  And finally, the statement must be a prior consistent statement made before the charge of recent fabrication or improper influence or motive arose.

State v. Leinen
, 1999 ND 138, ¶ 9, 598 N.W.2d 102 (citations omitted).

[¶38] Shannon Clauthier, the declarant, testified at the trial and was subject to cross-

examination.  Shannon Clauthier testified he was at a residence with Aguero and Moncada on the night of the murders, Aguero and Moncada left, Moncada returned a few hours later, Moncada told him Aguero shot two people but later said they shot two people, and Moncada asked him to get rid of a garbage bag located in a vehicle.  Shannon Clauthier testified he threw the garbage bag in the river and some clothes fell out of it.  Shannon Clauthier was interviewed about the murders by police on multiple occasions, beginning in October 2005.  

[¶39] During the trial, Aguero and Moncada portrayed Shannon Clauthier as a liar and claimed he was responsible for the murders.  Moncada and Aguero attacked Shannon Clauthier’s credibility by asking him about prior statements he made to law enforcement about the murders, arguing his statements had been inconsistent and he had said various other people were involved in the murders.  Brandy Clauthier testified that Shannon Clauthier told her in May 2005 that he and Aguero and Moncada killed the Belgardes and that he disposed of clothes and a gun in the river.  Shannon Clauthier’s statements to Brandy Clauthier were consistent with his testimony that Moncada and Aguero were involved in the Belgarde murders and that he disposed of a bag of clothing at Moncada’s request.  Shannon Clauthier’s statements to Brandy Clauthier were made in May 2005, prior to the charge of recent fabrication or improper motive.   

[¶40] Brandy Clauthier’s testimony is not hearsay under N.D.R.Ev. 801(d).  We conclude the court did not abuse its discretion by allowing the testimony.

VII

[¶41] Aguero argues the district court erred by failing to properly admonish the jury at every break or adjournment in the proceedings.  Under N.D.C.C. § 29-21-28, the court is required to admonish the jury:

The jurors also, at each adjournment of the court, whether permitted to separate or required to be kept in charge of officers, must be admonished by the court that it is their duty not to converse among themselves nor with anyone else on any subject connected with the trial, nor to form or express any opinion thereon, until the case is finally submitted to them.

Rule 6.11(b), N.D.R.Ct., also states that the court shall admonish the jurors in a criminal case at each adjournment not to converse among themselves or with anyone else about any subject connected to the trial and not to form or express an opinion about the case until it is submitted to them for deliberation.

[¶42] Here, the court did not admonish the jury at every break in the proceedings.  However, Aguero concedes that he did not object to the court’s failure to admonish the jury and he has not demonstrated any prejudice.  Under N.D.R.Crim.P. 52(a), we will disregard any error, defect, or irregularity that does not affect a defendant’s substantial rights.  
See also
 
State v. Ripley
, 2009 ND 105, ¶ 27, 766 N.W.2d 465 (the court’s failure to admonish the jury was harmless error when the defendant did not object or claim any prejudice).  Aguero does not claim the alleged error affected his substantial rights.  We therefore conclude any error was harmless and must be disregarded.  

VIII

[¶43] We affirm the judgments. 

[¶44] Dale V. Sandstrom

Maring, Justice, concurring in the result.

[¶45] I respectfully concur in the result because I do not believe the record or the law in this case supports the conclusion that Aguero and Moncada waived their right to be free of physical restraints.  I am of the opinion that the trial court erred by failing to make specific findings at the start of the guilt phase of the trial about the necessity of physical restraints and about the necessity of leg shackles instead of less prejudicial restraints.  

I

[¶46] On March 2, 2009, Joseph Daniel Moncada filed a “Motion in Limine Regarding Jury Selection, Courtroom Security and Demeanor.”  On March 16, 2009, Billy Joe Valdez Aguero joined Moncada’s motion.  In his motion, Moncada moved the trial court for an order allowing Moncada to appear before the jury “without visible restraints and in non-jail garb.” To support his request for non-visible restraints, Moncada relied heavily on this Court’s decision in 
In re R.W.S.
, 2007 ND 37, 728 N.W.2d 326, as well as the United States Supreme Court’s decision in 
Deck v. Missouri
, 544 U.S. 622 (2005).  In particular, Moncada argued he had the right to remain free of physical restraints that were visible to the jury and that no special security concerns existed that might otherwise warrant the use of visible restraints.  He proposed:  “There is a restraint that may be worn underneath the clothing of an accused that is more than adequate for security and still allows sedate movement to and from the witness stand with nothing more than a limp.”   

[¶47] The State responded to Moncada and Aguero’s motions regarding jury selection, courtroom security, and demeanor.  The State indicated it had no objection to Moncada and Aguero being allowed to wear non-jail clothing and not wearing visible restraints. On March 19, 2009, the trial court held a hearing and pretrial conference, at which the court considered Moncada and Aguero’s motions for non-visible restraints.  The trial court granted the motions.

[¶48] The final pretrial conference took place on Monday, June 15, 2009.  At the conference, the State made the following observation:

Next, Your Honor, I notice that the defendants today are not wearing leg restraints. I know that Mr. Martin’s request was, you know, for non visible restraints and we would request given the courtroom, I believe in Judge Kleven’s courtroom tables are set up where there is wood around the table, for safety purposes and the number of witnesses we would request the defendants wear leg restraints during the trial.

THE COURT: That was my understanding. Maybe there was a disconnect but there will be leg restraints. 

[¶49] During the entire voir dire Moncada and Aguero were not in physical restraints.  On June 16, 2009, after completion of voir dire and outside the presence of the jury, the State inquired whether Moncada and Aguero should be brought into the courtroom at 8:30 a.m. for the next day’s proceedings “because of the jury issues with the leg shackles.”   Aguero’s counsel echoed the State’s concern, explaining “Aguero [would] be on the outside and when the jurors walk in his leg shackles [would] be visible.”  The court responded:  “[The jury] won’t be looking at his feet.  Have him swing around the end of the table and then have him swing back.”

[¶50] The next day, June 17, 2009, at the opening of the jury trial and outside the hearing of the jury, Moncada’s counsel expressed his concern regarding the use of restraints during trial:  

I know the Court had previously ruled with respect to my request that my client appear without restraints during the course of the proceeding.  I don’t make a habit of coming back to court’s rulings.  I want to make sure I have this preserved for my record.  I hope that the Court understands that, Your Honor.

The case cite that I gave the court in my filing on this point is 
In the Interest of RWS
, 2007, North Dakota 37, 728 Northwest 2d 326.  That has all the applicable authorities cited with respect to the impact on the presumption of innocence that having a defendant appear in restraints causes that type of event.

To that, Your Honor, I would add I guess I can give the Court a real time factual basis, if you will.  My client has appeared in numerous proceedings before the court, pretrial hearings, preliminary hearings, there’s never been any difficulty with him whatsoever.

The last two days during jury selection he appeared without restraints.  There were no security concerns or issues during that time.  I know that the Court had indicated that you didn’t think they would be looking at the person’s ankles or feet.  That may or may not be true.  I can’t really say what would draw a juror’s attention but I do want to rest on that case for the purposes of preserving my record.

I would also note for the record that we tried to manufacture barriers using file boxes, basically as Lego blocks, but I don’t know if it’s going to be enough.  I sat in every single jury seat last night, yesterday afternoon, to see where the angle would be on this and those last two seats, I think, would still have an angle at the under side of the table.

So if the Court is going to deny my request for removal of restraints, could I ask the Court to add two more seats on the end and shift the jury down two chairs.

[¶51] Aguero’s counsel also requested the leg restraints be removed.  The trial court responded:  “We have bent over backwards the last couple days.  They could be in hand shackles as well.  From my point of view and from what I can see of counsel’s bench, the view of their feet is properly obstructed.  So your comments are made. They will remain shackled.”  And, in fact, both Moncada and Aguero remained shackled for the entire duration of the trial.  Based on this record, I am of the opinion Aguero and Moncada who were restraint free during the final pre-trial conference and voir dire requested at the beginning of the guilt phase of the trial to be similarly restraint free.  Therefore, based on 
In re R.W.S.
, 
State v. Kunze
, 2007 ND 143, 738 N.W.2d 472 , and 
Deck
, the trial court erred when it did not proceed to make specific findings about the necessity of physical restraints.

II

[¶52] Webster’s Dictionary defines shackle as “chain link . . . a metal fastening, usually one of a linked pair, for the wrists or ankles of a person kept prisoner . . . anything that restrains freedom of expression or action.”  
Webster’s New World Dictionary 
1306 (2d ed. 1980).  The record shows the trial court required Moncada and Aguero be shackled (wear leg restraints with a chain) after voir dire for the entire duration of the criminal trial.  In doing so, however, the trial court did not comply with the clear mandates set by this Court regarding the use of shackles during the guilt phase of a criminal trial.

A. The Applicable Law

[¶53] Relying on well-established United States Supreme Court precedent, this Court held in 
In re R.W.S.
 that the Federal Constitution prohibits the routine use of visible shackles on a defendant during the guilt phase of a criminal jury trial.  2007 ND 37, ¶ 13, 728 N.W.2d 326 (citing 
Deck
, 544 U.S. at 630-32); 
see also
 
Kunze
, 2007 ND 143, ¶¶ 15-16, 738 N.W.2d 472 (stating that “[c]ourts have long recognized that criminal defendants should not be physically restrained as a routine matter because of the prejudicial effect of such restraints”).  In 
Kunze
, this Court further explained that “[t]he Fifth and Fourteenth Amendments, which guarantee due process of law, ‘prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial.’” 
Id.
 at ¶ 17 (quoting 
Deck
, 544 U.S. at 629).  Our Court unequivocally held that in cases involving orders for physical restraints after our decision in 
In re R.W.S.
, a trial court must: 

[M]ake case-specific findings and explain on the record . . . its rationale for the order 
even in those instances in which the district court believes the reasons are readily apparent on the record
.  That explanation should include the reason for not accommodating a request for one type of restraint rather than the other when the reason is not obvious on the record.  

Id.
 at ¶ 24 (emphasis added).

[¶54] This Court used the rationale advanced by the United States Supreme Court in 
Deck
 to reach its conclusion that the routine use of physical restraints during a criminal trial was presumptively unconstitutional.  
See
 
In re R.W.S.
, 2007 ND 37, ¶ 13, 728 N.W.2d 326.  In 
Deck
, the United States Supreme Court outlined three fundamental legal principles to support its holding the routine use of physical restraints violated a criminal defendant’s constitutional right to fair and impartial trial.  544 U.S. at 630. 

First, the criminal process presumes that the defendant is innocent until proved guilty.  Visible shackling undermines the presumption of innocence and the related fairness of the factfinding process.  It suggests to the jury that the justice system itself sees a “need to separate a defendant from the community at large.”

Second, the Constitution, in order to help the accused secure a meaningful defense, provides him with a right to counsel.  The use of physical restraints diminishes that right.  Shackles can interfere with the accused’s “ability to communicate” with his lawyer. Indeed, they can interfere with a defendant’s ability to participate in his own defense, say, by freely choosing whether to take the witness stand on his own behalf.

Third, judges must seek to maintain a judicial process that is a dignified process . . . the use of shackles at trial “affront[s]” the “dignity and decorum of judicial proceedings that the judge is seeking to uphold.”

Id.
 at 630-31 (citations omitted); 
see also
 
In re R.W.S.
, 2007 ND 37, ¶ 13, 728 N.W.2d 326 (referring to the United States Supreme Court considerations against the routine use of visible physical restraints).  In 
In re R.W.S.
, this Court used the latter two considerations, the right to secure a meaningful defense and the dignity of the judicial process, to extend the right to remain free of shackles to juvenile proceedings, in which the concern for jury bias is clearly inapplicable.  
Id.
 at ¶ 15.  By doing so, our Court effectively determined that an accused has a constitutional right to remain free of shackles during a criminal trial, even when it is a non-jury trial or when the  restraints are not visible to the jury.  
See
 
id.
; 
see also United States v. Durham
, 287 F.3d 1297, 1304 (11th Cir. 2002) (“Even if the physical restraints placed upon the defendant are not visible to the jury, they still may burden several aspects of a defendant’s right to a fair trial.”); 
In the Matter of Millican
, 906 P.2d 857, 859 (Or. Ct. App. 1995) (“Although most often invoked as a safeguard against potential jury prejudice, the right to stand trial unshackled also ensures that defendants ‘may face the court with the appearance, dignity and self-respect of a free and innocent person.’”) (citation omitted).

[¶55] As the United States Supreme Court has explained, however, the right of an accused to appear free of shackles during trial is not absolute and may be overcome by essential state interests.  
Deck
, 544 U.S. at 628; 
see also
 
In re R.W.S.
, 2007 ND 37, ¶ 16, 728 N.W.2d 326.  Specifically, the United States Supreme Court has held state interests such as physical security, escape prevention, or courtroom decorum could prevail over the general prohibition against the routine use of physical restraints.  
Deck
, 544 U.S. at 628.  But before a trial court can overcome the presumed unconstitutionality of physical restraints, the court must “make a case-specific determination about restraining the defendant,” taking into consideration such factors as “the accused’s record and temperament, the desperateness of the accused’s situation, the security situation at the courtroom and courthouse, the accused’s physical condition, and whether there is an adequate means of providing security that is less prejudicial.”  
Kunze
, 2007 ND 143, ¶ 18, 738 N.W.2d 472.  Furthermore, the trial court must explain its findings on the record and must make clear its rationale for ordering physical restraints.  
Id.
 at ¶ 24; 
see also
 
Williams v. Norris
, No. 09-1062, 2010 WL 2772676, at *13 (8th Cir. July 15, 2010) (stating that in determining the appropriateness of shackles, a trial court must engage in a “particularized inquiry,” as required by 
Deck
, and must also provide “adequate justifications” for the ordering of shackles); 
United States v. Joseph
, 333 F.3d 587, 591 (5th Cir. 2003) (“The district court is required to state, outside the presence of the jury, the reasons for which it has chosen to shackle the defendant.”); 
Durham
, 287 F.3d at 1308 (holding that a trial court must “articulate, on the record, a rationale for its decision to impose particular security measures”).  Finally, when a trial court decides to order physical restraints, it “must impose no greater restraints than are necessary.”  
Kunze
, at ¶ 19; 
see also
 
Gonzalez v. Piller
, 341 F.3d 897, 900 (9th Cir. 2003) (holding that a court “must pursue less restrictive alternatives before imposing physical restraints”); 
Durham
, 287 F.3d at 1304 (explaining that reviewing courts must inquire whether the trial court considered “less restrictive, less prejudicial methods of restraints”). 

B. Standard of Review 

[¶56] This Court reviews a trial court’s decision whether to physically restrain a defendant during trial for an abuse of discretion.  
See
 
In re R.W.S.
, 2007 ND 37, ¶ 1, 728 N.W.2d 326.  A trial court “abuses its discretion when it acts in an arbitrary, unreasonable, or unconscionable manner, or when it misinterprets or misapplies the law.”  
Kunze
, 2007 ND 143, ¶ 14, 738 N.W.2d 472.

[¶57] In determining whether the trial court abused its discretion in ordering physical restraints, this Court first considers whether the trial court made case-specific findings and articulated its reasons for placing the defendant in physical restraints on the record.  
Kunze
, 2007 ND 143, ¶¶ 21, 24, 738 N.W.2d 472.  At this stage of appellate review, the Court also looks at whether, prior to ordering the physical restraints, the trial court considered less restrictive and less prejudicial methods of restraints.  
Id.
 at ¶ 21.  This Court also stated in 
Kunze
 that a trial court’s failure to explain its reasons for restraining a defendant does not constitute reversible error when the reasons for the restraints are readily apparent from the record.  
Id.
 at ¶ 21.

[¶58] In 
Kunze
, however, the trial court held a hearing to consider the State’s request for restraints.  2007 ND 143, ¶¶ 3, 22, 738 N.W.2d 472.  At the hearing, the State verbally provided the court with information about the defendant’s prior history of more than 50 assaults and threats to guards and several escapes.  
Id.
  In addition, a deputy testified about using leg irons and belly chains when transporting the defendant because of his past record of escapes and his assaultive behavior toward guards.  
Id.
 at ¶¶ 4, 22  After considering the evidence and arguments of the parties, the trial court decided to restrain the defendant.  
Id.
 at ¶¶ 7, 22.  Our Court held that, although the trial court did not elaborate on the record its reasons for its order, the reasons for hand restraints and a restraining belt were readily apparent from the record.  
Id.
 at ¶ 23.  Our Court also recognized that at the time of Kunze’s trial, no North Dakota ruling had addressed the use of shackles.  
Id.
 at ¶ 23.  However, a case “where the record itself makes clear that there are indisputably good reasons for shackling” is “an exceptional case.”  
See
 
Deck
, 544 U.S. at 635.   Moreover, as the United States Supreme Court held in 
Deck
:

[W]here a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation. The State must prove beyond a reasonable doubt that the shackling error complained of did not contribute to the verdict obtained.

Id.
 (citation omitted).   If  the trial court’s decision to physically restrain the defendant was an error, in violation of the defendant’s due process rights, the analysis then turns to whether the violation was harmless error.  
In re R.W.S.
, 2007 ND 37, ¶ 19, 728 N.W.2d 326.  An error is harmless if the court is convinced, beyond a reasonable doubt, that the error did not contribute to the verdict.  
Id.
  In making this determination, our court must review the entire record and consider all the evidence.  
Id.
  The party benefitting from the error bears the burden of proving the error is harmless beyond a reasonable doubt.  
Id.
 

C.  The Majority Opinion

[¶59] I cannot agree with the majority’s conclusion that the trial court did not need to make specific findings on the necessity of restraints.  This Court has stated, in 
Kunze
, that a trial court’s failure to explain its reasons for restraining the defendant would be considered reversible error unless those reasons are readily apparent from the record before it and concluded that in cases involving orders for physical restraints henceforth, the court must make case-specific findings even if the court believes the reasons are readily apparent on the record.  2007 ND 143, ¶ 21, 738 N.W.2d 472.  No such reasons can be discerned from the record in this case.

[¶60] The majority assumes that counsels’ requests for non-visible restraints at a pre-

trial hearing in March 2009, were a full waiver to any objections to having Moncada and Aguero appear in leg shackles before the jury.  
Majority
, at ¶ 11.  The majority’s conclusion is flawed for two reasons. 

[¶61] First, even if counsels’ requests for non-visible leg restraints can be viewed as a waiver of the trial court’s duty to make specific findings about the necessity of any restraints, the trial court nevertheless failed to explain why after initially granting counsels’ motions for non-visible restraints, and allowing Moncada and Aguero to appear for two days of jury selection without restraints, it later reversed its ruling and ordered them to wear chained leg restraints during trial.  A chain that runs between the legs of a person is a restraint visible to a jury.  Further, I do not believe defense counsel should be required to build a box wall with the hope of preventing a jury from seeing the restraints.  In addition, this Court’s prior decisions regarding the use of the least restrictive and prejudicial methods of restraints are clear:  “The district court should [] consider on the record whether less restrictive, less prejudicial methods of restraint could be used.”  
Kunze
, 2007 ND 143, ¶ 21, 738 N.W.2d 472.  Moreover, as this Court held in 
Kunze
, the trial court should explain its reasons for “not accommodating a request for one type of restraint rather than the other when the reason[s] [are] not obvious on the record.”  
Id.
 at ¶ 24.  The reasons are not obvious in this case.

[¶62] The record here shows that Moncada and Aguero filed motions requesting to appear before the jury without visible restraints.  Moncada’s motion explained:  “There is a restraint that may be worn underneath the clothing of the accused that is more than adequate for security and still allows sedate movement to and from the witness stand with nothing more than a limp.”  The State did not object to the requests and the trial court granted the motions for non-visible restraints at the pretrial conference and hearing on March 19, 2009.  However, after two days of jury selection at which Moncada and Aguero appeared free of restraints, but before the trial commenced, the trial court ignored its previous ruling and ordered them to wear leg shackles for the duration of the proceedings.  In doing so, the trial court disregarded not only defense counsels’ requests for them to appear free of restraints and numerous objections, but also the State’s concern the leg restraints were readily visible to the jury.  The trial court’s response that the jury “won’t be looking at Aguero’s feet” clearly does not qualify as the type of explanation required by this Court in cases when the trial court refuses to accommodate a request to be shackle free or for a certain type of restraints. 

[¶63] Here, despite its initial ruling, the  trial court declined to accommodate counsels’ requests for non-visible restraints and ordered Moncada and Aguero leg shackled during trial.  The trial court, however, failed to explain its reasons for ordering leg shackles over the requested restraints that would be worn under the clothing.  As Moncada’s counsel pointed out on several occasions, there were no security risks posed by Moncada.  Moncada had appeared in a number of other proceedings before the court without shackles and had never created any safety concerns.  Furthermore, as Moncada’s counsel noted in his motion for non-visible restraints, methods less restrictive and less prejudicial than the leg shackles were readily available and could have alleviated any courtroom security concerns of the State.  Yet, the trial court, without offering any explanation, chose to order Moncada and Aguero to wear leg shackles during trial.  Such response implies a routine policy of ordering leg restraints.  The trial court’s error was its failure to make any findings on the record explaining its reasons for not accommodating Moncada and Aguero’s requests for non-visible restraints.

[¶64] Second, the majority’s analysis is flawed because of its misplaced emphasis on the “visibility” of the shackles.  The majority states: “In this case, there is no evidence in the trial record that the jury saw the restraints.”  
Majority
, at ¶ 13.  In doing so, the majority ignores this Court’s prior holding in 
In re R.W.S.
 that even in non-jury trials, when “the concerns about the effect of visible physical restraints on a jury do not apply,” considerations about a defendant’s ability to secure a meaningful defense and about the dignity of the judicial process militate against the routine use of visible physical restraints.  2007 ND 37, ¶ 15, 728 N.W.2d 326.  The United States Supreme Court in 
Deck
 provided three fundamental legal principles in support of its conclusion that the routine use of physical restraints violated an accused’s right to a fair and impartial trial:  (1) the presumption of innocence; (2) the right of an accused to secure a meaningful defense; and (3) the dignity of judicial proceedings. 
Deck
, 544 U.S. 630-31; 
see also
 
Illinois v. Allen
, 397 U.S. 337, 344 (1970) (stating that physical restraints impair a defendant’s ability to participate in his defense and damage the integrity of criminal trials).  Accordingly, lower courts interpreting 
Deck
 have held that “[e]ven if the physical restraints placed upon the defendant are not visible to the jury, they still may burden several aspects of a defendant’s right to a fair trial.” 
Durham
, 287 F.3d at 1304; 
see also
 
Gonzales
, 341 F.3d at 899-900 (explaining that in ordering physical restraints, a trial court should consider not only the effect physical restraints may have on the jury, but also the effect the restraints may have on defendant’s ability to participate in the defense of the case and on defendant’s mental faculties); 
In the Matter of Millican
, 906 P.2d at 859 (stating that, “[a]lthough most often invoked as a safeguard against potential jury prejudice, the right to stand trial unshackled also ensures that defendants ‘may face the court with the appearance, dignity and self-respect of a free and innocent person’”) (citation omitted).  In addition, other courts have stated that when a defendant is shackled at trial the key issues are “
whether the jury ‘was aware of’ the shackles or whether the shackles ‘were readily visible
.’”  
Roche v. Davis
, 291 F.3d 473, 483 (7th Cir. 2002) (emphasis added) (citations omitted). 

[¶65] Therefore, the majority’s assumption that the “visibility” of the shackles is dispositive in the present case runs afoul of well-established legal principles.  In overruling counsels’ objections and ordering the use of leg shackles, rather than the previously requested and approved non-visible restraints, the trial court simply stated:  “[F]rom what I can see of counsel’s bench, the view of [Moncada and Aguero’s] feet is properly obstructed.”  This type of reasoning falls short of what is required in terms of specific findings.  The majority holds that “nothing in the record support[s] the defendants’ claim that the restraints were visible . . . .”  
Majority
, at ¶ 13.  The majority’s conclusion the leg shackles were non-visible restraints, however, is not supported either by the record or by case-law. 

[¶66] The record here reflects the trial court ordered defendants wear leg restraints with chains.  Rather than simply considering whether evidence in the record supports a finding the jury in fact saw the restraints and then disposing of the issue, the majority should have also considered whether the restraints were “readily visible” to the jury and whether the jury was aware of the restraints.  Moreover, even if the restraints were not “readily” visible to the jury, the proper legal analysis requires a reviewing court to also consider the probable effect of leg restraints on a defendant’s ability to secure a meaningful defense and on the integrity and dignity of the judicial proceedings.  By failing to do so, the majority clearly disregards the legal standard set forth in 
Deck
 and 
In re R.W.S.
 Had the majority applied the correct legal analysis adopted by this Court in cases involving shackling, the majority would have had no other choice but to hold that the trial court’s failure to provide both an explanation of the trial court’s reasons not to accommodate Moncada and Aguero’s requests for less prejudicial, non-visible restraints and its failure to make specific findings about the necessity for any physical restraints, was clear error.

III

[¶67] As this Court explained in 
In re R.W.S.
, however, once a constitutional violation has been established, our Court must then consider whether the violation was harmless error.  2007 ND 37, ¶ 19, 728 N.W.2d 326; 
see also
 
Gonzalez
, 341 F.3d at 903 (stating that “shackling, except in extreme forms, is susceptible to harmless error analysis”).  The beneficiary of the error, the State in this case, bears the burden of proving the error is harmless beyond a reasonable doubt.  
In re R.W.S.
, at ¶ 19.  Here, the evidence in the record is overwhelmingly in support of the guilty verdicts.  Thus, even under the proper legal analysis, the trial court’s error was harmless beyond a reasonable doubt and did not affect Moncada and Aguero’s substantial rights.  Therefore, I concur in the result, but write separately to address the majority’s failure to apply the proper legal analysis as established by this Court in 
In re R.W.S.
 and 
Kunze
 and as supported by the United States Supreme Court’s decision in 
Deck
.    

[¶68] Mary Muehlen Maring

VandeWalle, Chief Justice, concurring specially.

[¶69] 
I agree with the result reached by the majority opinion.  I write specially to encourage the trial courts to make the appropriate findings in these matters.

[¶70] In 
State v. Kunze
, 2007 ND 143, ¶ 24, 738 N.W.2d 472 we stated:

In cases ordering restraints decided by the district court after our decision in 
In re R.W.S.
 [2007 ND 37, 728 N.W.2d 326], the district court is to make case-specific findings and explain on the record, and at greater length than in this case, its rationale for the order even in those instances in which the district court believes the reasons are readily apparent on the record.  That explanation should include the reason for not accommodating a request for one type of restraint rather than the other when the reason is not obvious on the record.

[¶71] The Court would not be required to parse the record in an attempt to justify the trial court’s action or to determine the trial court’s reasons and rationale or engage in a harmless error analysis if the findings are made as directed in 
Kunze
.  Although here we do both, our decision in this case should not be viewed as retreating from our statement in 
Kunze
.

[¶72] Gerald W. VandeWalle, C.J.

Kapsner, Justice, concurring in the result.

[¶73] I concur in the result and join in Parts III, IV, V, VI, VII and VIII of Justice Sandstrom’s opinion.

[¶74] I do not join in Part II because I do not believe the singular analysis of whether the restraints were visible is sufficient under 
Deck v. Missouri
, 544 U.S. 622 (2005).  Instead, having determined the trial court erred by failing to make findings for allowing shackles instead of restraints worn under the clothing in accord with its previous order, it becomes the state’s burden to demonstrate, beyond a reasonable doubt, that the error did not contribute to the verdict.  
Deck
, 544 U.S. at 635.  To decide whether the burden has been met, it is necessary to examine the entire record and determine, in light of all the evidence, the probable effect of the error upon the verdict.  Based upon a review of all the evidence on the record supporting the conviction and the lack of any evidence on the record that the jury actually saw the shackles, I conclude the error was harmless beyond a reasonable doubt.

[¶75] Carol Ronning Kapsner

Daniel J. Crothers